In re Benjamin Ronald CRAHAL-
LA, District Justice In and For
Magisterial District 38–1–20.

No. 2 JD 99.

Court of Judicial Discipline
of Pennsylvania.

March 6, 2000.

---

**3.** There is a Connellsville Township Zoning *Hearing* Board, which is a separate entity and not a part of this case.

Before SYLVESTER, President Judge and SWEENEY, PANELLA, BYER, RUSSO, SPOSATO, LEADBETTER and MILLER, JJ.

## OPINION IN SUPPORT OF THE ORDER OF DISMISSAL

RUSSO, J.; joined by SYLVESTER, President Judge, PANELLA, J., and SPOSATO, J.

The undisputed facts in this case are that the Respondent wrote a letter announcing "the 1999 Good Scout Award Dinner" and seeking contributions benefiting the Cradle of Liberty Council of the Boy Scouts of America. Respondent sent these form letters in his capacity as Chairman of the Cradle of Liberty Council of the Boy Scouts of America Dinner. Upon being advised by a fellow district justice who had received the letter that this might constitute a violation of one of the Rules Governing Standards of Conduct of District Justices, Respondent immediately withdrew as Chairman of the Dinner. I view this as a case which should not be in this Court, and I would dismiss the Complaint.

The Board has charged Respondent with a violation of Rule 11 of the Rules Governing Standards of Conduct of District Justices. That rule provides that: "A district justice shall not solicit funds for any educational, religious, charitable, fraternal or civic organization, . . . ."

■ One observation about that rule which would be unlikely to provoke controversy is that the proscribed activity is not inherently bad: if it is inherently anything, it is inherently good. Asking for contributions for the Boy Scouts is not an inherently evil act. It does not involve moral turpitude. It is, therefore, activity which our scholarly legal forefathers would classify as *malum prohibitum* —as opposed to, as distinguished from, *malum in se*.[1] This is a hoary jurisprudential distinction which is not hard to understand, and I would require some degree of *mens rea*[2] before finding a violation of this rule. In this case there was no "guilty mind" or "wrongful purpose"—no *mens rea* whatsoever—as demonstrated by Respondent's immediate resignation as Dinner Chairman upon being advised that serving in that capacity was a possible violation of a Rule of Conduct.

1. *Malum in se* is defined: "A wrong in itself; an act . . . involving illegality from the very nature of the transaction, upon principles of natural, moral, and public law. An act is said to be *malum in se* when it is inherently and essentially evil, that is, immoral in its nature and injurious in its consequences, . . . ." Black's Law Dictionary 6th Ed., p. 959.

*Malum prohibitum* is defined as: "A wrong prohibited; a thing which is wrong *because* prohibited; an act which is not inherently immoral, but becomes so because its commission is expressly forbidden by positive law." (Emphasis in original). *Id.* at 960.

2. *Mens rea* is defined as: "As an element of criminal responsibility; a guilty mind; a guilty or wrongful purpose; a criminal intent." *Id.* at 985.

In coming to this conclusion, I take guidance from the opinion of the United States Supreme Court in *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952). In that case, Morissette, while deer hunting in an uninhabited area in Michigan, took a quantity of spent bomb casings which he found heaped in piles on a former Air Force bombing range. He believed the casings were abandoned and made no effort to conceal his appropriation of them. He was indicted and convicted of stealing government property. The trial court refused to submit or to allow counsel to argue that Morissette acted "with innocent intention." The Supreme Court reversed, and, in reviewing this ruling, examined the raison d'etre for the requirement of criminal intent as an element of criminality in our jurisprudence. The Court observed:

> The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil. [Citing Radin, Intent, Criminal, 8 Encyc.Soc.Sci. 126, for the history and philosophy of this concept in Biblical, Greek, Roman, Continental and Anglo–American law, and 2 Pollock and Maitland, History of English Law 448–511 for a more extensive treatment of the development in English Law, and Pound, Introduction to Sayre, Cases on Criminal Law (1927).] ... Unqualified acceptance of this doctrine was indicated by Blackstone's sweeping statement that to constitute any crime there must first be a "vicious will." ... Crime, as a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand, was

congenial to an intense individualism and took deep and early root in American soil. As the states codified the common law of crimes, even if their enactments were silent on the subject, their courts assumed that the omission did not signify disapproval of the principle but merely recognized that intent was so inherent in the idea of the offense that it required no statutory affirmation. Courts, with little hesitation or division, found an implication of the requirement as to offenses that were taken over from the common law. The unanimity with which they have adhered to the central thought that wrongdoing must be conscious to be criminal is emphasized by the variety, disparity and confusion of their definitions of the requisite but elusive mental element. However, courts of various jurisdictions, and for the purposes of different offenses, have devised working formulae, if not scientific ones, for the instruction of juries around such terms as "felonious intent," "criminal intent," "malice aforethought," "guilty knowledge," "fraudulent intent," "wilfulness," "*scienter*," to denote guilty knowledge, or "*mens rea*," to signify an evil purpose or mental culpability. By use or combination of these various tokens, they have sought to protect those who were not blameworthy in mind from conviction of infamous common-law crimes.

*Morissette v. United States*, 342 U.S. 246, 250–252, 72 S.Ct. 240, 96 L.Ed. 288.

The Court then pointed out that with the coming of the industrial revolution came the proliferation of a myriad of what it termed "public welfare offenses"[3] many of which did not include a legislatively imposed requirement of specific intent as a necessary element. In rationalization or justification of the elimination of this element, the Court observed that the statutory penalties for these offenses:

3. Relating, for example, to the regulation of the distribution of food, drink, drugs, and products of any kind, even securities, workplace safety, motor vehicle traffic, environmental pollution. *See*, Sayre, Public Welfare Offenses, 33 Colum.L.Rev. 55, 73, 84, and, more generally, Hall, Prolegomena to a Science of Criminal Law, 89 U. of Pa.L.Rev. 549; Hall, Interrelations of Criminal Law and Torts, 43 Colum.L.Rev. 753, 967.

commonly are relatively small, and conviction does no grave damage to an offender's reputation. Under such considerations, courts have turned to construing statutes and regulations which make no mention of intent as dispensing with it and holding that the guilty act alone makes out the crime.

*Id.* at 256, 72 S.Ct. 240.

Before lumping the Rule of Conduct here involved with the "public welfare offenses" referred to by the Supreme Court in *Morissette* and dismissing the absence of specific intent from our deliberations, I believe the following considerations are important, and call for the opposite conclusion on the question:

1. In *Morissette*, the Supreme Court stated that the courts' construing statutes and regulations which make no mention of intent as dispensing with it "has not, however, been without expressions of misgiving." *Morissette, supra,* at 256, 72 S.Ct. 240. And the Supreme Court hastened to add:

> Neither this Court nor, so far as we are aware, any other has undertaken to delineate a precise line or set forth comprehensive criteria for distinguishing between crimes that require a mental element and crimes that do not. We attempt no closed definition, for the law on the subject is neither settled nor static.

*Id.* at 260, 72 S.Ct. 240.

It is, therefore, the courts' ongoing responsibility to assess the legislative intent on a case by case basis to determine whether that intent would be thwarted by requiring *scienter* as a necessary element of a given offense. *See, United States v. Balint,* 258 U.S. 250, 251–252, 42 S.Ct. 301, 66 L.Ed. 604 (1922).

In this case, the legislative purpose to discourage the conduct described in Rule 11, is not thwarted by requiring the element of *scienter* to constitute a violation of the rule, but is given full effect by Respondent's self-correction instantly imposed without the necessity of any coercion or encouragement from the Judicial Conduct Board.

2. The "penalties" attendant to a finding of a violation of Rule 11 are not "relatively small," [4] ranging, as they do, from reprimand to removal from office.

3. Whereas the Supreme Court found the effect of a conviction of a public welfare offense on the reputation of the offender as negligible, the injury to the reputation of a judicial officer "disciplined" by this Court cannot be overassessed.

4. Another Supreme Court case, *Lambert v. California,* 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957) provides, I think, insight into discovering what guides that Court in determining when specific intent or *scienter* should constitute a necessary element of an offense.

In that case the defendant was convicted under a California law which required anyone convicted of a felony to register with the local police. Stating the question to be: "whether a registration act of this character violates due process where it is applied to a person who has no actual knowledge of his duty to register," the Court stated:

> We do not go with Blackstone in saying that "a vicious will" is necessary to constitute a crime, 4 Bl.Comm. 21, for conduct alone without regard to the intent of the doer is often sufficient. There is a wide latitude in the lawmakers to declare an offense and to exclude elements of knowledge and diligence from its definition. [citation omitted]. But we deal here with conduct which is wholly pas-

4. See, also, e.g., *People ex rel. Price v. Sheffield Farms Co.,* 225 N.Y. 25, 32–33, 121 N.E. 474, 477 (1918) where then Judge Cardozo pointed out, as a basis for penalizing violations whether intentional or not, that they were punisha-

ble only by fine "moderate in amount" and added "we are not to be understood as sustaining to a like length the power to imprison."

sive—mere failure to register. It is unlike the commission of acts, or the failure to act under circumstances which should alert the doer to the consequences of his deed.

*Lambert v. California, supra,* at 228, 78 S.Ct. at 242–243.

Thus, the Supreme Court in *Lambert* drew the line in the constitutional sand on the basis of "passive" versus "active"—a notion which the dissenting Justices easily exposed as a contrivance employed to reach a result deemed just and desirable by the majority of the Court. Mr. Justice Frankfurter, writing the dissent, pointed out that:

The present laws of the United States and of the forty-eight States are thick with provisions that command that some things not be done and others be done, although persons convicted under such provisions may have had no awareness of what the law required or that what they did was wrongdoing.... Considerations of hardship often lead courts, naturally enough, to attribute to a statute the requirement of a certain mental element—some consciousness of wrongdoing and knowledge of the law's command—as a matter of statutory construction.... But what the Court here does is to draw a constitutional line between a State's requirement of doing and not doing. What is this but a return to Year Book distinctions between feasance and nonfeasance—a distinction that may have significance in the evolution of common-law notions of liability, but is inadmissible as a line between constitutionality and unconstitutionality.

Thus, it is apparent that the Supreme Court was not determining the location of the line on the basis of a distinction between "active" and "passive" but rather on whether the right result is clearly recognizable—as it was in *Lambert,* and, I believe, is, certainly, here. So, I would here, for various considerations, hardship included, "attribute to [this rule] the requirement of a certain mental element—some

consciousness of wrongdoing and knowledge of the [rule's] command—as a matter of statutory construction."

5. The decision of the United States Supreme Court in the more recent case of *Staples v. United States,* 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994) confirms this conclusion.

In that case, Staples was charged with possessing an unregistered machinegun in violation of 26 U.S.C. § 5861(d). The weapon in question was a semiautomatic rifle—not a machinegun—which had been modified to provide fully automatic fire. Staples maintained that he was ignorant of any automatic firing capability. The district court refused, however, to charge the jury that the Government was required to prove that Staples knew of that capability. He was convicted and the Court of Appeals affirmed. The Supreme Court reversed.

The Supreme Court construed the statute requiring the registration of machineguns as requiring a showing of *mens rea* even though the statute was silent on that subject. Its holding was based on two major points:

(1) the nature of the regulated conduct (the ownership of firearms) was not such that would alert gun owners to the likelihood of regulation (because owning guns is lawful), and

(2) the penalty attached was not relatively small as are those commonly associated with "public welfare offenses," but severe (up to ten years imprisonment), so that it was unlikely that Congress intended to dispense with *mens rea* as a necessary element of the offense.

On the first point, after noting that the statute was silent concerning the *mens rea* required for a violation, the Court, drawing liberally from its earlier opinion in *Morissette, supra,* stated:

[T]he existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo–American criminal

jurisprudence.... Relying on the strength of the traditional rule, we have stated that offenses that require no *mens rea* are generally disfavored, *Liparota [v. United States,* 471 U.S. 419,*] supra,* at 426 [105 S.Ct. 2084, 85 L.Ed.2d 434 (1985)], and have suggested that some indication of congressional intent, express or implied, is required to dispense with *mens rea* as an element of a crime. *Id.* at 605–606, 114 S.Ct. at 1797.

Referring to "public welfare offenses" which do not require *mens rea*, the Court stated:

Typically, our cases recognized such offenses involve statutes that regulate potentially harmful or injurious items.... In such situations, we have reasoned that as long as a defendant knows that he is dealing with a dangerous device of a character that places him "in responsible relation to a public danger," [*United States v.*] *Dotterweich [*320 U.S. 277,*] supra,* at 281 [64 S.Ct. 134, 88 L.Ed. 48 (1943)], he should be alerted to the probability of strict regulation, .... Thus, we essentially have relied on the nature of the statute and the particular character of the items regulated to determine whether congressional silence concerning the mental element of the offense should be interpreted as dispensing with conventional *mens rea* requirements. *Id.* at 607, 114 S.Ct. at 1798.

In this context the Court addressed the possession of firearms which was involved in the case at hand, as follows:

But that an item is "dangerous," in some general sense, does not necessarily suggest, as the Government seems to assume, that it is not also entirely innocent. Even dangerous items can, in some cases, be so commonplace and generally available that we would not consider them to alert individuals to the likelihood of strict regulation. As suggested above, despite their potential for harm, guns generally can be owned in perfect innocence. Of course, we might surely classify certain categories of guns—no doubt including the machineguns, sawed-off shotguns, and artillery pieces that Congress has subjected to regulation—as items the ownership of which would have the same quasi-suspect character we attributed to owning hand grenades in Freed. But precisely because guns falling outside those categories traditionally have been widely accepted as lawful possessions, their destructive potential, while perhaps even greater than that of some items we would classify along with narcotics and hand grenades, cannot be said to put gun owners sufficiently on notice of the likelihood of regulation to justify interpreting § 5861(d) as not requiring proof of knowledge of a weapon's characteristics.

*Staples v. United States,* 511 U.S. at 611–612, 114 S.Ct. at 1800. If the dangerousness of firearms is not enough to alert an individual to the likelihood of regulation so as to justify dispensing with *mens rea,* then neither is soliciting funds for the Boy Scouts.

On the second point the Court said:

Historically, the penalty imposed under a statute has been a significant consideration in determining whether the statute should be construed as dispensing with *mens rea.* Certainly, the cases that first defined the concept of the public welfare offense almost uniformly involved statutes that provided for only light penalties such as fines or short jail sentences.... As commentators have pointed out, the small penalties attached to such offenses logically complemented the absence of a *mens rea* requirement. In a system that generally requires a "vicious will" to establish a crime, 4 W. Blackstone, Commentaries, imposing severe punishments for offenses that require no *mens rea* would seem incongruous.

*Id.* at 616–617, 114 S.Ct. at 1802–1803. The Court concluded:

We need not adopt such a definitive rule of construction to decide this case, however. Instead, we note only that where, as here, dispensing with *mens rea* would require the defendant to have knowledge only of traditionally lawful conduct [possessing guns], a severe penalty is a further factor tending to suggest that Congress did not intend to eliminate a *mens rea* requirement.

*Id.* at 618, 114 S.Ct. at 1804.

As mentioned earlier, the penalties to which judicial officers who violate the Rules of Conduct are exposed are severe and the injury to their reputations large, and, thus, the Supreme Court's decision in *Staples* is a strong statement against the elimination of a *mens rea* requirement in this case.

6. I liken the element of self-correction in this case to the rationale for the designation of "Renunciation" as a defense to the offense of Criminal Solicitation. This is set out at 18 Pa.C.S.A. § 902 which, after reciting the definition of solicitation, provides:

(b) Renunciation—It is a defense that the actor, after soliciting another person to commit a crime, persuaded him not to do so or otherwise prevented the commission of the crime, *under circumstances manifesting a complete and voluntary renunciation of his criminal intent* (emphasis added).

5. Opinion Contra Dismissal at 990, fn. 1.

6. *Id.*

7. Prior decisions of this Court and of the Supreme Court confirm this understanding. See, e.g., *In re Cicchetti*, 697 A.2d 297 (Pa.Ct. Jud.Disc.1997), *aff'd*, 743 A.2d 431 (2000) and *In re Hasay*, 666 A.2d 795 (Pa.Ct.Jud.Disc. 1995), *aff'd* in part and reversed in part on other grounds, 546 Pa. 481, 686 A.2d 809 (1996), and *In re Larsen*, 655 A.2d 239 (Pa.Ct. Jud.Disc.1994). In *Cicchetti* and *Hasay* this Court rejected the Board's contention that we had no authority to review the Board's interpretation *of it's own rules and procedures;* in *Hasay* the Supreme Court held:

Certainly, Respondent's immediate resignation as Dinner Chairman manifests his complete and voluntary renunciation of any impropriety and constituted a self-executing enforcement of Rule 11.

■ For these reasons I would hold that the drafters of Rule 11 did not intend to eliminate a *mens rea* requirement for violation of the rule, and Respondent's immediate and voluntary cessation of the activity establishes the absence of that element in this case, and I would dismiss the Complaint.

Finally, I believe brief comment on several points mentioned in Judge Byer's Opinion Contra Dismissal is appropriate.

1. The Opinion Contra Dismissal discountenances dismissal of the complaint attributing serious importance to the "independent and broad prosecutorial discretion"[5] of the Judicial Conduct Board and, in deference thereto, warns that "this Court should not interfere with the exercise of that discretion."[6] This is a puzzling statement for it is my understanding that it is a primary duty of this Court to oversee the Board's exercise of its prosecutorial discretion and to dismiss complaints where, in this Court's view, the Board oversteps its discretionary authority.[7] Otherwise, it seems to me, the function of this Court is reduced to that of minister or adjutant of the Board bound to entertain any case which the Board de-

We emphatically reject the assertion that the board's compliance with its rules of procedure is absolutely beyond judicial review. The rules exist in part to insure that due process is accorded judicial officers subject to investigation and prosecution by the board.... Every minor or technical violation of the board's rules may not be a denial of due process, and the appropriate remedy may be a minor matter; nonetheless, the guarantee of due process requires that the board's procedures be reviewable. 686 A.2d at 816–817.

In *Larsen*, this Court rejected the notion, advanced by the Board, that this Court had no authority, to oversee the Board's discretion in its determination to seek interim suspension of a judicial officer charged with a felony.

cides to dress with formal charges. That this is indeed the role to which the members who join the Opinion Contra Dismissal would relegate this Court is manifested because, though acknowledging that this case should not be in this Court,[8] they nevertheless abide by their "non-interference" doctrine and would compliantly proceed to entertain it.

2. The Opinion Contra Dismissal notes, with disapproval, that this opinion "is based upon concepts of criminal law,"[9] and, as cachet for its disapproval, quotes a line from this Court's opinion in *In re Cicchetti,* 697 A.2d 297, 307 (Pa.Ct.Jud. Disc.1997): "It is settled in Pennsylvania that judicial disciplinary proceedings are not criminal in nature, ...."[10] I believe a number of observations are called for on this point.

(a) While no issue is taken with the quotation—the statement is certainly true—the quoted language is contained in a paragraph where this Court is calling attention to concepts of criminal law which *do* apply to judicial disciplinary proceedings. See *Cicchetti, supra,* at 307.

(b) This Court's opinion in *Cicchetti* draws copiously from opinions of other courts in criminal cases and rests its decisions respecting a number of issues on principles so gleaned.[11]

(c) The Constitution itself engrafts principles of criminal law on these judicial disciplinary proceedings. For example, the Constitution requires public and speedy trials in this Court, prescribes that our proceedings be conducted "in accordance with the principles of

due process" and provides that the subject of the charges "shall be presumed innocent." Pa. Const., Art. V, § 18(b)(5).

(d) I am aware of no statement in any of the opinions of this Court (until now) expressing disapproval of our taking guidance from criminal cases.

(e) It is my understanding—it is my belief—that we should take guidance wherever we find it.[12]

3. The Opinion Contra Dismissal cites *Commonwealth v. Coon,* 695 A.2d 794 (1997) for the proposition that the *mens rea* discussed in this opinion is not a factor to be considered in determining whether to sustain a conviction of a crime in a criminal court. With all respect, it appears that *Coon* makes no such holding.

In that case, Coon's next door neighbor and a congregation of his guests were having a little target practice in the course of a birthday party. Apparently, the gunfire of the partygoers was interfering with Coon's attempts at a midafternoon nap, so he ripped off a couple of shotgun blasts over the heads of the celebrators. For his efforts Coon was awarded with a conviction of a misdemeanor of the third degree. In reversing the conviction the Superior Court said:

> Appellant [Coon] alleges that the Commonwealth failed to prove that ... he had the proper *mens rea.* We agree.
>
> To convict appellant ... the Commonwealth was required to prove that appellant intended to cause substantial harm to the *public* or serious *public* inconve-

**8.** However, we believe ... this might have been an appropriate case for informal disposition at the Board level. Opinion Contra Dismissal at 990, fn. 1.

**9.** *Id.* at 991.

**10.** *Id.*

**11.** For example, what constitutes "misconduct in office", charges brought out of time, concurrent prosecution under general Crimes

Code (perjury) and Election Code (filing false affidavits) were issues decided exclusively in that case by reference to the body of criminal law. These decisions were affirmed by our Supreme Court.

**12.** It appears that the members who join Judge Byer's Opinion Contra Dismissal believe this as well, exercising as they do, no perceptible resistance to the temptation to cite criminal cases (and statutes) when convenient.

nience.... Here, the Commonwealth has failed to prove that appellant had the requisite intent to cause substantial harm to the *public*....

\* \* \* \* \* \*

Even if we were to determine that the "public was affected" in this case, the Commonwealth would still be required to prove that appellant had the proper *mens rea*.

695 A.2d at 798. (Emphasis the Court's.) Thus, the Court held that even if the neighborhood party was found to be "public" the Commonwealth case fails if the defendant didn't think it was "public." So it would seem that the Superior Court of Pennsylvania has no more banished *mens rea* from the body of Jurisprudence than has the Supreme Court of the United States.

4. The Opinion Contra Dismissal cites a number of cases from "across the country" as support for the proposition, put differently from case to case, that neither intent, knowledge, wilfulness, scienter nor *mens rea* is necessary to a finding of an ethical violation. With regard to these cases I point out:

(a) There is no charge upon this Court to follow decisions rendered in other states.

(b) That is not to say that I cannot take guidance from the opinions of courts of other states—If they are germane. However, the cases referred to by the Opinion Contra Dismissal are not germane because the conduct in each of the cases with which those courts were dealing came with *built-in mens rea*. A brief review of the cases demonstrates that.

In *Barr*[13] (Texas) the respondent was charged with repeated sexually offensive conduct.

In *Douglas*[14] (Vermont) the respondent converted court funds in a court bank account to his own personal use.

In *Patterson*[15] (Connecticut) the respondent purchased real estate from an estate which his court was supervising.

In *Neely*[16] (West Virginia) the respondent required his judicial secretary to serve as his babysitter.

In *Flanagan*[17] (Connecticut) the respondent engaged in adultery with his court reporter and an assistant district attorney.

In *Gustafson*[18] (Oregon) the respondent was "disrespectful," "impatient," "undignified," and "discourteous" to litigants in his court.

(c) There is no attempt by any of the courts in these cases to make any analysis of the rationale for including or not including *mens rea* as a requisite for finding a violation, nor any reference to the cases of the United States Supreme Court cited *supra*, which do contain thoughtful and scholarly analyses of the question.

For these reasons, I find these cases unpersuasive and as providing no derivative inclination to favor them while concomitantly ignoring the decisions of the Supreme Court of the United States, thorough, and carefully written, as they are.

5. Finally, I note that the Opinion Contra Dismissal mentions that Respondent "does not contest" that he violated Rule 11.[19] This Court held in *In re Strock,* 727 A.2d 653 (Pa.Ct.Jud.Disc.1998) that:

We do not believe that this Court should accept and adopt as its own, without

13. Opinion Contra Dismissal at 992.

14. *Id.* at 992.

15. *Id.* at 992.

16. *Id.* at 992.

17. *Id.* at 992.

18. *Id.* at 992.

19. *Id.* at 993.

examination, stipulations that specified facts (a) support whatever charges the Board and any given respondent stipulate they support, and (b) justify this Court's entering Conclusions of Law that a respondent is subject to discipline for violation of specified constitutional and ethical precepts simply because a given respondent so concedes.

*Id.* at 660.

In my opinion, that proposition, as well as the reasons therefor set out in *Strock*, 727 A.2d at 660–662, apply in this case; and concessions by Respondent on points of law should have no place in our adjudication, particularly where the Respondent is appearing *pro se* as here.

The Complaint should be dismissed.

## OPINION CONTRA DISMISSAL

BYER, J.; joined by SWEENEY, J., LEADBETTER, J., and MILLER, J.

### INTRODUCTION

The Judicial Conduct Board has charged Respondent, a district justice, with disciplinary offenses which arise out of Respondent having served as chairman of a fundraising committee for a charitable event. The Board and Respondent have waived their right to trial, and have submitted stipulations of fact in lieu of trial pursuant to C.J.D.R.P. No. 502(D)(1).

### FINDINGS OF FACT

The parties have stipulated to the following facts, which we adopt as our Findings of Fact:

1. The Judicial Conduct Board ("Board") is empowered by Article V, § 18 of the Pennsylvania Constitution to file formal charges alleging ethical misconduct on the part of judges, justices, or justices of the peace and to present the case in support of the formal charges before the Court of Judicial Discipline.

2. District Justice Benjamin Ronald Crahalla ("Respondent") is the duly elected district justice serving Magisterial District 38-1-20 which is located in Montgomery County, and is part of the 38th Judicial District of Pennsylvania. Magisterial District 38-1-20 encompasses the Townships of Perkiomen and Lower Providence and the Boroughs of Trappe and Collegeville.

3. Respondent has continuously served as District Justice for Magisterial District 38-1-20 since January 4, 1988.

4. On or about April 22, 1999, the Respondent agreed to serve as Chairman of the Good Scout Award Dinner for the Cradle of Liberty Council of the Boy Scouts of America. The dinner was scheduled to be held at the Collegeville Inn on Tuesday, June 29, 1999 and was held on that date.

5. On or before May 17, 1999 the Respondent in his role as dinner Chairman, permitted form letters to be sent by the *Council inviting persons to attend the dinner*. That form letter stated:

I am delighted to announce the 1999 Good Scout Award dinner, benefiting (*sic*) Cradle of Liberty Council, Boy Scouts of America. Cradle of Liberty Council provides a quality family program for over 87,000 youth throughout Montgomery, Delaware and Philadelphia counties. The Good Scout Award dinner raises money to support the program in all its facets.

This year's recipient of the Good Scout Award is Dr. John Strassburger, President of Ursinus College. The dinner will be held on Tuesday, June 29, 1999 at the Collegeville Inn, located at 3978 Ridge Pike in Collegeville. There will be a reception at 6:00 PM followed by dinner and an awards ceremony from 7:00 to 9:00 PM.

I invite you to join me on June 29, 1999 to honor Dr. John Strassburger with the Good Scout Award. Enclosed you will find an invitation for your use.

Cordially,
(Signature)
Benjamin R. Crahalla,
*District Justice*
Good Scout Award Chairman

This form letter also displayed, as "letter-head", a symbol of the Cradle of Liberty Council of the Boy Scouts of America along with the following text:

> 1999 Good Scout Award
> Benjamin R. Crahalla, Chairman
> Cradle of Liberty Council, Boy Scouts of America

6. The letter was signed by the Respondent and the accompanying invitation form contained the Respondent's photograph, which he had provided to the Council, and identified him as: Benjamin R. Crahalla(,) District Justice.

7. The dinner was designed to raise funds for the Cradle of Liberty Council of the Boy Scouts of America and raised more than $15,000.00.

## DISCUSSION

### I.

Rule 11 of the Rules Governing Standards of Conduct of District Justices provides:

> A district justice shall not solicit funds for any educational, religious, charitable, fraternal or civic organization, or use or permit the use of the prestige of his office for that purpose, but he may be listed as an officer, director or trustee of such an organization. He shall not be a speaker or the guest of honor at such an organization's public fund raising events, but he may attend such events.

Rule 11 expressly prohibits the type of conduct to which the parties have stipulated Respondent engaged. As the authors of a leading text on this subject

explain, "[t]he purpose of the prohibition is to avoid the misuse of the judicial office. The rule addresses the dual fears that potential donors either may be intimidated into making contributions when solicited by a judge, or that they may expect future favors in return for their largesse. The possibility of corruption in fund-raising is remote, although not unknown. In either case, the dignity of the judiciary suffers, and, since most charitable organizations can raise funds perfectly well without the involvement of judges, a broad prohibition was deemed appropriate." Jeffrey M. Shaman, Steven Lubet, James J. Alfini, *Judicial Conduct and Ethics*, 295 (3d ed.2000). This prohibition applies with the same force to solicitations for the Boy Scouts as it does to other charitable solicitations, *Id.* at 297, and neither the worthiness of the cause nor the risk of actual corruption matter in the face of the absolute prohibition on such conduct by members of the judiciary.

Although, as the Board has represented in its pre-trial statement, Respondent appears to have resigned as chairman after he learned such participation was improper, the facts as stipulated and as we have found establish that Respondent is subject to discipline under Article V, § 18(d) of the Pennsylvania Constitution. Respondent's effort to withdraw from the prohibited conduct after completion of the offense might have a bearing on sanctions, but it is not a defense to liability.

### II.

We reject the views expressed in the Opinion in Support of the Order of Dismissal by Judge Russo for several reasons.[1] These reasons are in addition to

---

1. Judge Russo states, "[I]n my view this is a case which should not be in this Court...." Although we do not agree with that conclusion, we observe that the offense involved in this case is not serious and, in light of the level of cooperation between the parties and Respondent's willingness to accept responsibility for his actions, we think this case would have come easily within the Board's "letter of counsel" procedure under Rule 31(A)(2) of the Judicial Conduct Board's Rules of Procedure. We recognize that Article V, Section 18(a) of the Pennsylvania Constitution vests the Board with independent and broad prosecutorial discretion, and that this Court should not interfere with the exercise of that discre-

the fact that the Opinion in Support of the Order of Dismissal raises purported defenses which Respondent (wisely in our opinion) has not chosen to advance on his own behalf.

Preliminarily, the Opinion in Support of the Order of Dismissal is based upon concepts of criminal law. We disagree with the Opinion in Support of the Order of Dismissal's interpretation and application of those precepts. More fundamentally, disciplinary charges are not criminal charges, and concepts of criminal law do not apply. *In re Cicchetti,* 697 A.2d 297, 307 (Pa.Ct.Jud.Disc.1997) ("It is settled in Pennsylvania that judicial disciplinary proceedings are not criminal in nature. . . ."), *aff'd,* —— Pa. ——, 743 A.2d 431 (2000).

To the extent criminal law concepts have any bearing, those concepts actually support our holding, rather than the view expressed by Judge Russo in the Opinion in Support of the Order of Dismissal. The Opinion in Support of the Order of Dismissal argues that Respondent cannot be found culpable for violating Rule 11 in the absence of a determination that he possessed what Judge Russo and the members who join him would consider to be the requisite *"mens rea."* However, if this were a criminal case, the prosecution would not have to prove that Respondent acted with any greater intent than an intent to commit the act which violates the rule. 18 Pa.C.S. § 302(h) ("Neither knowledge nor recklessness as to whether conduct constitutes an offense or as to the existence, meaning or application of the law determining the elements of an offense is an element of such offense, unless the definition of the offense or this title so provides.") The prosecution would not have to prove that Respondent intended to violate the law or to commit an unlawful act. *Commonwealth v. Coon,* 695 A.2d 794, 798 (Pa.Super.1997) ("A person acts intentionally with respect to a material

element of an offense when . . . it is his conscious object to engage in conduct of that nature or to cause such a result .") (citing *Commonwealth v. Sanders,* 426 Pa.Super. 362, 627 A.2d 183, 186 (1993)).

Here, Respondent concedes that he committed the act which Rule 11 proscribes. Respondent does not contend that he acted unconsciously, involuntarily, accidentally, under duress or as the result of a mistake of fact with respect to the act itself.

Furthermore, the cases which the Opinion in Support of the Order of Dismissal cites are distinguishable. There is nothing obscure about Rule 11 of the Rules Governing Standards of Conduct of District Justices, nor can it be argued that Respondent lacked notice of the Rules. Lack of notice of a registration ordinance is the primary issue in *Lambert v. California,* 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957), which Judge Russo cites. District justices and other judicial officers in this Commonwealth are required to know and abide by the applicable Rules governing their conduct. Furthermore, the Rules are readily accessible and not so numerous as to make a presumption of "notice" unfair.

Contrary to the implication of the Opinion in Support of the Order of Dismissal, the prohibition of charitable fund-raising by judicial officers is well known by members of the judiciary, as evidenced by the large number of advisory opinions which judicial officers have requested on this subject. *See* Jeffrey M. Shaman, Steven Lubet, James J. Alfini, *Judicial Conduct and Ethics,* 296 (3d ed.2000). "[I]t is clear that judges are aware of the ethical restrictions on fund raising, and are not hesitant to seek guidance on the issue." *Id.* Thus, the notion that the prohibition of Rule 11 should be treated as some sort of obscure regulation instead of something which should be within the common knowledge of members of the judiciary is one

tion. However, we believe it appropriate to comment that, unless there are circumstances concerning Respondent of which we are not

aware, this might have been an appropriate case for informal disposition at the Board level.

which we strongly reject, particularly because of what that notion inaccurately implies about the level of awareness by members of the Pennsylvania judiciary concerning the ethical requirements applicable to them.

In any event, this is not a criminal case, but a judicial disciplinary case. Judicial disciplinary cases from across the country hold that the offending judicial officer need only have the intent to commit the act in question unless further intent is expressly required by the rule. *See, e.g., In re Douglas,* 135 Vt. 585, 592–593, 382 A.2d 215, 219 (1977) (judge disciplined for accepting discounted advertising rates) ("There are many cases censuring or otherwise penalizing judges for conduct otherwise legal and noncriminal. Good faith may be taken into account on disposition, but is no bar to a finding of the breach of judicial duty."); *Patterson v. Council on Probate Judicial Conduct,* 215 Conn. 553, 567, 577 A.2d 701, 708 (1990) (judge disciplined for purchasing property from a probate estate that his court adjudicated) ("Scienter is not essential for the occurrence of an ethical violation."); and *In re Neely,* 178 W.Va. 722, 727, 364 S.E.2d 250, 255 (1987) (judge disciplined for requiring his staff to perform personal errands, despite his contention that his actions were proper).

Even statutes that include a *mens rea* requirement of "knowing" or "willful" conduct require only that the defendant have knowledge that he is engaging in the conduct (i.e., the sending of a letter soliciting participation in a charitable fundraising event), not knowledge that such conduct violates a rule. *See, e.g., In re Complaint as to the Conduct of Gustafson,* 305 Or. 655, 660, 756 P.2d 21, 24 (1988) ("... a judge's conduct is 'wilful' (*sic*) ... if the judge intends to cause a result or take an action contrary to the applicable rule and if he is aware of circumstances that in fact make the rule applicable, whether or not the judge knows that he violates the rule."); *In re Barr,* 1998 WL 58975, 1998 Tex. LEXIS 34, *31 (Tex.1998) ("Respondent is susceptible to discipline for 'willful' violations of [judicial canons] ... as long as he intended to engage in conduct for which he is disciplined, whether or not he formed the specific intent to violate those canons."); *In re Flanagan,* 240 Conn. 157, 183, 690 A.2d 865, 878 (1997) ("A judge may be sanctioned for a wilful (*sic*) violation of one of the canons of judicial conduct if he intended to engage in the conduct for which he is sanctioned 'whether or not [he] knows that he violates the rule' ... To require that a judge subjectively have known that his conduct was in violation of the canons of judicial conduct would make it extremely difficult, if not impossible, to discipline a judge ... for violating those canons.") (internal citations omitted). *U.S. v. Jennings,* 855 F.Supp. 1427, 1439 (M.D.Pa.1994) (" 'General intent' is defined as '[I]n criminal law, the intent to do that which the law prohibits. It is not necessary for the prosecution to prove that the defendant intended the precise harm or the precise result which eventuated.' ") (internal citation omitted); *State v. Danforth,* 125 Wis.2d 293, 295, 371 N.W.2d 411, 413 (1985) ("Intent is an element of a crime only if it is required by statute ... [The child abuse statute] requires only the intent to do the act that causes injury; the resulting injury itself need not be intended.") (internal citation omitted); and *People v. Lonergan,* 219 Cal.App.3d 82, 95, 267 Cal.Rptr. 887, 895–96 (Cal.Ct.App.1990) ("It is well settled that the requirement of acting 'knowingly' is satisfied when the person committing the act has knowledge of the facts although not of the law. 'Knowingly' does not require knowledge of the unlawfulness of the act itself.") (internal citations omitted).

The Opinion in Support of the Order of Dismissal would have the result of imposing a lower standard of culpability for judicial officers than for laypersons—a result we find unacceptable. Ignorance of the law will not excuse a defendant who has

sufficient notice of a crime. *Lambert*, 355 U.S. at 228, 78 S.Ct. at 243, 2 L.Ed.2d 228.

In this case, Respondent had ample notice of the Rules Governing Standards of Conduct of District Justices. Respondent intended to write the solicitation letter. Therefore, regardless of Respondent's lack of malicious intent, sending the letter constituted a violation of Rule 11. Respondent's conduct after sending the letter was admirable, and might well be a basis for this Court to conclude after a hearing on the subject that no sanction is necessary; however, the Board has proven that Respondent has violated Rule 11, a conclusion which Respondent, to his credit, does not contest.

## CONCLUSIONS OF LAW

1  The facts as stipulated by the parties and as found by this Court are sufficient to satisfy the Board's burden of proving that Respondent violated Rule 11 of the Rules Governing Standards of Conduct of District Justices.

2.  Respondent is subject to discipline in accordance with Article V, § 18(d) of the Pennsylvania Constitution.

## ORDER TO DISMISS COMPLAINT

AND NOW, this 6th day of March, 2000, inasmuch as the Court is evenly divided, the Complaint against Respondent is dismissed pursuant to Article V, § 18(b)(4) of the Pennsylvania Constitution.