In re Donald L. WHITTAKER Magisterial District Judge In and For Magisterial District 11–3–02 Luzerne County.

No. 1 JD 07.

Court of Judicial Discipline of Pennsylvania.

April 10, 2008.

Order April 22, 2008.

BEFORE: LAMB, P.J., and SPRAGUE, P.J.E., O'TOOLE, MUSMANNO, BUCCI and KURTZ.

OPINION BY Judge BUCCI.

## I.  *INTRODUCTION*

The Judicial Conduct Board (Board) filed a Complaint with this Court against

Magisterial District Judge Donald L. Whittaker (Respondent) consisting of three counts which charge Respondent with:

1. violation of Article V, § 18(d)(1) of the Pennsylvania Constitution by engaging in conduct which brings the judicial office into disrepute (Count 1),

2. violation of Rule 4C of the Rules Governing Standards of Conduct of Magisterial District Judges by failing to be patient, dignified and courteous to litigants, witnesses, lawyers and others with whom they deal in their official capacity, and shall require similar conduct of lawyers, of their staff and others subject to their direction and control[1],

3. violation of Rule 15A of the Rules Governing Standards of Conduct of Magisterial District Judges by holding another office or position of profit in the government of the United States, the Commonwealth or any political subdivision thereof, except in the armed services of the United States or the Commonwealth (Count 3).

The charges in Count 1 arise from conduct of Respondent, alleged to have occurred on three occasions: January 24, 2005, January 26, 2005, and May 6, 2005. This complaint was made by one Maryann Kearney, who alleged that Respondent made crude, embarrassing and inappropriate remarks on the dates listed above and, on January 26, 2005 twisted her neck causing injury to her right shoulder (paragraphs 3–13 of the Complaint and Count 1). We find that the Board did not sustain its burden of establishing by clear and convincing evidence the allegations made by Maryann Kearney.

The charges in Count 3 arise out of Respondent's employment as a fire apparatus operator by Newport Township, Luzerne County (paragraphs 14–16 of the Complaint and Count 3). For the reasons set forth below, and based on this Court's holding in *In re Crahalla*, 747 A.2d 980 (Pa.Ct.Jud.Disc.2000), we hold that the Board has not established a violation of Rule 15A of the Rules Governing Standards of Conduct of Magisterial District Judges.

The Board and the Respondent have submitted stipulations of fact as to some of the issues in the case under C.J.D.R.P. No. 502(D)(2). The Court accepted these stipulations of fact (three in number) and proceeded to trial on the unresolved issues. This Court now makes the following findings of fact—facts 1, 2 and 49 being stipulated by the parties and findings 3–48, 50–55 being made by the Court after trial.

## II. *FINDINGS OF FACT*

I. INTRODUCTORY

1. Pursuant to Article V, § 18 of the Constitution of the Commonwealth of Pennsylvania, the Board is granted authority to determine whether there is probable cause to file formal charges, and when it concludes that probable cause exists, to file formal charges against a justice, judge or justice of the peace, for proscribed conduct and to present the case in support of such charges before the Court of Judicial Discipline. (Stipulated.)

2. Since on or about January 3, 1994, and at all times relevant hereto, the Respondent served as a District Justice and, as renamed, a Magisterial District Judge of Magisterial District 11-3-02, Luzerne County, Pennsylvania, encompassing the City of Nanticoke; Townships of Newport

---

1. By Order dated July 19, 2007 we dismissed Count 2.

and Plymouth; and the Borough of Plymouth, with an office located at 15 East Ridge Street, Nanticoke, Pennsylvania 18634. (Stipulated.)

3. The Board filed a Complaint against Respondent on April 30, 2007.

4. The Board divided the Complaint into two parts: The first part (paragraphs 3–13 (Part A in this Opinion)) is given the heading "Inappropriate and Offensive Language and Conduct" and contains the allegations of Maryann Kearney regarding events alleged to have occurred on three occasions:

January 24, 2005,

January 26, 2005, and

May 6, 2005.

Count 1 is based on these allegations [2], and charges that Respondent's conduct on those dates was such that brings the judicial office into disrepute—a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution.

The second part of the Complaint (paragraphs 14–16 (Part B in this Opinion)) is given the heading "Conflicting Public Employment" and alleges that Respondent's employment as a fire truck operator by the Newport Township Fire Department, at the same time as he was serving as a Magisterial District Judge—which allegations the Respondent does not dispute—constitutes a violation of Rule 15A of the Rules Governing Standards of Conduct of Magisterial District Judges.

## PART A. INAPPROPRIATE AND OFFENSIVE LANGUAGE AND CONDUCT

5. Maryann Kearney has been employed by the Wyoming Valley Sanitary Authority for the last 16 years. (N.T. 58).

6. On the dates in question, January 24 and 26, 2005 and May 6, 2005, and for many years prior thereto, she worked in the Nanticoke City Municipal Building. (N.T. 59). This is a one-story building where she worked along with all the other municipal employees who testified in this trial. (N.T. 22, 59, 108, 116, 126, 132, 136, 152). The police department is located in the basement. (N.T. 16).

7. Maryann Kearney worked in an open space behind a counter which faced the public hallway where people came to pay their sewer bills. (N.T. 62). Her office space was adjacent to the Respondent's Magisterial District Court facility which consisted of his office, his staff's office and a courtroom. (Joint Exhibit 6).

8. Most of the employees who worked in the building were females. (N.T. 108).

9. The atmosphere among those who worked in this building was very friendly, very casual, open and informal; it was a relaxed family atmosphere. (N.T. 82, 108, 117, 138, 153).

10. It was not uncommon for the employees in this building to tell dirty jokes to each other or to use off color language. (N.T. 28, 31, 83, 112, 117, 126, 129, 133, 136, 138–39, 154).

11. While at work in the Nanticoke City Municipal Building, Maryann Kearney commonly used words such as "shit," "bitch," "ass," "fuck" (Zendarski, N.T. 31), the "F bomb" (Wall, N.T. 110), "bite me," "weird stuff," "the Lord's name in vain" (Wolfe, N.T. 118), "the F-word and so forth" (Kruczek, N.T. 127), "foul language" (Cheshinski, N.T. 132, Navroth, N.T. 136–37), "asshole," the "F-word" (Wiaterowski, N.T. 154), "shit," "hell," "son of a bitch," "damn it." (Kearney, N.T. 83).

---

**2.** Count 2 was as well, but, as noted earlier, Count 2 was dismissed.

12. The employees who worked in the Nanticoke City Municipal Building belonged to a "Birthday Club." Maryann Kearney was in charge of the Club and collected small amounts of money from the employees with which she purchased birthday cards for the employees including Respondent for delivery on their respective birthdays. These cards were passed around and signed by the employees and then given to the employee whose birthday it was. (N.T. 34, 75–76, 109–110, 115, 119–120, 126–27, 132, 136, 153–54, 167–68).

13. Four birthday cards which were given to Respondent were introduced at trial (Respondent's Exhibits 1, 2, 3 and 5). Each of these cards conveys a frankly sexual message with accompanying illustrations. Maryann Kearney selected each of these cards. (Zendarski, N.T. 34–39, 44, Wall, N.T. 109, 115, Wolfe, N.T. 119–20, Kruczek, N.T. 126–27, Cheshinski, N.T. 132, Navroth, N.T. 136, Wiaterowski, N.T. 153–54, Whittaker, N.T. 168).

14. Maryann Kearney signed the card which is Respondent's Exhibit 2 with the note "Happy Birthday to the 45 year old Monster." The word "Monster" was Kearney's reference to Respondent's penis. (Respondent's Exhibit 2, N.T. 36, 44–45, 78, 96, 168).

15. On the occasion of Respondent's 45th birthday, Maryann Kearney purchased a pin which she attached to Respondent's birthday card. The pin stated "You are cordially invited to go fuck yourself." (Respondent's Exhibit 4, N.T. 38–39).

16. Prior to January 24, 2005, the relationship between Maryann Kearney and Respondent was open, friendly and cordial (N.T. 166), and there was no animosity, ill feelings or difficulties between them. (N.T. 61).

### Incident of January 24, 2005

17. At the trial Maryann Kearney testified that on January 24, 2005, as she was returning to her desk from the ladies room, Respondent asked her in the presence of five or six men who were waiting to pay their sewer bills, "if [she] needed a pencil to work it out." (N.T. 63–65). She testified that she was "highly embarrassed" and "really embarrassed" by this remark. (N.T. 66).

18. Leonard Nardozzo was one of the five or six men who were present in the vicinity waiting to pay their sewer bills. (N.T. 64–65).

19. Leonard Nardozzo did not hear any conversation between Respondent and Maryann Kearney on that occasion, including what Maryann Kearney said Respondent said to her. (N.T. 142–43).

20. Maryann Kearney never told Respondent that the alleged remark embarrassed her, or that it offended her in any way. (N.T. 85).

21. Maryann Kearney never told anyone, including any of the other women who worked in the building with whom she had a close working relationship, that this alleged remark embarrassed her, or that it offended her in any way. (N.T. 33–34, 85–86, 131).

22. Maryann Kearney did not file any complaint with the Judicial Conduct Board until August 22, 2005—seven months later. In her complaint, she makes no mention of the incident alleged to have occurred on January 24, 2005. (N.T. 86–87, Respondent's Exhibit 6).

23. It was not until April 28, 2006, in a letter of that date which Respondent wrote to Board Investigator Delaney over a year later, that she made any report of the events she alleged occurred on January 24, 2005. (N.T. 92–93).

24. Maryann Kearney delayed reporting this alleged incident to the Board until April 28, 2006, after she read a newspaper article reporting that a judge had been disciplined for using vulgar language and shortly before Respondent had to face an opponent in the May primary election.

25. There is no evidence to explain or justify Maryann Kearney's delay in reporting Respondent's alleged remark of January 24, 2005 which she testified "highly embarrassed" her.

26. With the exception of Leonard Nardozzo, none of the "five or six men" waiting at the counter to pay their sewer bills were identified.

### Incident of January 26, 2005

27. On January 26, 2005, Patricia Zendarski, who was employed in the Nanticoke City Municipal Building, was seated at her desk in the vestibule area of the Mayor's office talking with Maryann Kearney when Respondent entered Patricia Zendarski's work area and began conversing with Patricia Zendarski and Maryann Kearney. (N.T. 22–24).

28. Maryann Kearney began to blow her nose whereupon Respondent asked her "Did you get it all out?" or "Are you digging for gold?" or words to that effect. (N.T. 24, 27, 67, 87, 163). Maryann Kearney responded by asking Respondent "Why, do you want to help?" (N.T. 67, 86–87, Respondent's Exhibit 6).

29. Respondent then placed his left hand on Maryann Kearney's right shoulder or neck, touching her lightly and briefly. Respondent did not twist Maryann Kearney's neck or use any force at all. (N.T. 24–25, 29, 163–64, Board's Exhibit 2).

30. Maryann Kearney did not appear to be in any discomfort or pain at that time. (N.T. 25).

31. Patricia Zendarski said she then heard Respondent ask Maryann Kearney "How do you give Bill a blow job?" (N.T. 24, 30, Board's Exhibit 2). Respondent denies saying this. (N.T. 182–83, 196).

32. Maryann Kearney never alleged or complained that Respondent said "How do you give Bill a blow job?"—not in her complaint to the Nanticoke Police (Board's Exhibit 1), not in the Complaint she filed with the Judicial Conduct Board (N.T. 90, Respondent's Exhibit 6), not in the letter she wrote to the Judicial Conduct Board on April 28, 2006, and not in her testimony at the trial. (N.T. 57–105).

33. Maryann Kearney never told Respondent that his "digging for gold" remark embarrassed her or in any way offended her. (N.T. 87–88).

34. Maryann Kearney never told anyone including any of the other women who worked in the building with whom she had a close working relationship that Respondent's "digging for gold" remark embarrassed her or offended her in any way. (N.T. 33–34, 131).

35. Maryann Kearney reported Respondent's "did you get it all out" remark and Respondent's alleged assault and battery to the Nanticoke police on January 26, 2005.

36. Maryann Kearney did not make any complaint to the Judicial Conduct Board regarding Respondent's alleged conduct on January 26, 2005 until August 22, 2005—seven months later. (Respondent's Exhibit 6).

37. Maryann Kearney was not embarrassed or offended by Respondent's "did you get it all out" or "are you digging for gold" remark.

### Incident of May 6, 2005

38. The Complaint alleges, and Maryann Kearney testified, that on May 6, 2005, Respondent entered the Nanticoke Municipal Building through the back door

and walked into the lunchroom where a number of female employees were located. A few of the females remarked that he looked nice whereupon the Respondent replied: "How are you cunts doing?" (Complaint), or "Hey, you cunts, how are you doing?" (Kearney's testimony at trial). They told him they did not like the word and Respondent walked back out of the room. (Complaint, para. 13, N.T. Kearney, 71–72, Kruczek, 129).

39. At the time of this occurrence Maryann Kearney was seated at her desk and did not and could not see Respondent. (N.T. 73, 125, and Joint Exhibit 6).

40. The lunchroom is located around a corner approximately 75 feet from Maryann Kearney's desk. (N.T. 73–74, 125, 160–62 and Joint Exhibit 6).

41. The lunchroom is an enclosed room and is separated from Maryann Kearney's desk not only by its own walls but by the hallway walls which form the corner which obstructs the view from Maryann Kearney's desk. (N.T. 72–74, 125, 160–62, Joint Exhibit 6).

42. It was not established which female employees were in the lunchroom on May 6, 2005 whom Respondent was allegedly addressing as "cunts"; but the only testimony given by the female employees is that none of them heard Respondent use the word "cunts" on May 6, 2005 (Zendarski, N.T. 32, Kruczek, N.T. 129, Cheshinski, N.T. 132, Navroth, 136) or on any other day. (Zendarski, N.T. 33, Wall, N.T. 97, Wolfe, N.T. 118, Kruczek, N.T. 129, Cheshinski, N.T. 132, Navroth, N.T. 136, Wiaterowski, N.T. 153.)

43. Maryann Kearney never told Respondent that the alleged remark embarrassed her or offended her in any way. (N.T. 91–92).

44. Maryann Kearney never told anyone, including any of the other women who worked in the building with whom she had a close working relationship that this alleged remark embarrassed her or offended her in any way. (N.T. 34, 131).

45. Maryann Kearney did not file any complaint with the Judicial Conduct Board until August 22, 2005—seven months later. In her complaint, she makes no mention of the incident alleged to have occurred on May 6, 2005. (N.T. 91–92, Respondent's Exhibit 6).

46. It was not until April 28, 2006, in a letter of that date which Respondent wrote to Board Investigator Delaney a year later, that she made any report of the events she alleged occurred on May 6, 2005.

47. Maryann Kearney delayed reporting this alleged incident to the Board until April 28, 2006, after she read a newspaper article reporting that a judge had been disciplined for using vulgar language and shortly before Respondent had to face an opponent in the May primary election.

48. There is no evidence to explain or justify Maryann Kearney's delay in reporting Respondent's alleged remark of May 6, 2005.

## PART B. CONFLICTING PUBLIC EMPLOYMENT

49. Since approximately 2000–01 through December 2006, Respondent was employed, part time, by Newport Township as a fire apparatus operator. His total wages for 2005 were approximately $2,800. (Stipulated).

50. At all times relevant hereto, Respondent resided in Newport Township. (N.T. 158–59).

51. Respondent reported his employment with the Newport Township Fire Department and the income derived therefrom to the Supreme Court of Pennsylvania on the Statements of Financial Interest

required to be filed annually for each of the years he was so employed. (N.T. 159, Joint Exhibits 1, 2, 3, 4).

52. Respondent took this job as a fire truck driver partly as a community service because the Fire Department was having difficulty finding qualified fire truck drivers. (N.T. 159).

53. Respondent returned most of his earnings from this job to the Newport Township community for the ASPCA, the Lions Club, the Biddy Basketball Association, Little League and the like. (N.T. 159).

54. Upon receiving notice from the Board that his employment with the Newport Township might be a violation of a Rule Governing Standards of Conduct of Magisterial District Judges, Respondent immediately resigned from the job. Since then he has served as an unpaid volunteer. (N.T. 160).

55. At no time during his employment with the Newport Township Fire Department did Respondent know that the employment might be a violation of a Rule Governing Standards of Conduct of Magisterial District Judges or any ethical standard; and at no time during his employment with the Newport Township Fire Department did Respondent have any consciousness that it might be a violation of Rule 15A of the Rules Governing Standards of Conduct of Magisterial District Judges. (N.T. 8, 159–60, Joint Exhibits 1, 2, 3, 4).

## III. DISCUSSION

The constitutional amendment of 1993 establishing this Court provided certain specific instructions for the conduct of proceedings before this Court:

All hearings conducted by the court shall be public proceedings conducted pursuant to the rules adopted by the court and in accordance with the principles of due process and the law of evidence. Parties appearing before the court shall have a right to discovery pursuant to the rules adopted by the court and shall have the right to subpoena witnesses and to compel the production of documents, books, accounts and other records as relevant. The subject of the charges shall be presumed innocent in any proceeding before the court, and the board shall have the burden of proving the charges by clear and convincing evidence.

Pa. Const. Article V, § 18(b)(5).

The Pennsylvania Supreme Court has defined clear and convincing evidence as follows:

The witnesses must be found to be credible, that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order, and that their testimony is so clear, direct, weighty, and convincing as to enable the [trier of fact] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. . . . It is not necessary that the evidence be uncontradicted provided it "carries a clear conviction to the mind" or "carries a clear conviction of its truth."

In re Adoption of J.J., 511 Pa. 590, 515 A.2d 883, 886 (1986). See, also, LaRocca's Trust, 411 Pa. 633, 640, 192 A.2d 409, 413 (1963).

Acting pursuant to C.J.D.R.P. No. 501, the President Judge appointed a Panel to conduct the trial of this case. The Panel, consisting of Conference Judge Bucci, President Judge Lamb, and Judge Musmanno conducted the trial on January 3, 2008. Findings of Fact were initially made by the Panel.

Since the Constitution requires that "all actions of the court ... shall require approval by a majority vote of the members of the court" (Pa. Const. Article V, § 18(b)(4)) the Panel's Findings of Fact have been reviewed and this Decision is rendered by the full Court. Mindful of the reality, long jurisprudentially recognized, that assessments of credibility are best made by one who hears the witnesses testify and observes their demeanor, the Court is obliged to accord special deference to the Panel's Findings of Fact. The Supreme Court of Pennsylvania has addressed the subject as follows:

> As long as sufficient evidence exists in the record which is adequate to support the finding found by the trial court, as fact finder, we are precluded from overturning that finding and must affirm, thereby paying the proper deference due to the fact finder who heard the witnesses testify and was in the sole position to observe the demeanor of the witnesses and assess their credibility. This rule of law is well established in our jurisprudence and is rooted in concepts of fairness, common sense and judicial economy. (citations omitted).

*Commonwealth Dept. of Transportation v. O'Connell,* 521 Pa. 242, 248, 555 A.2d 873, 875 (1989). See, also, the observations of the United States Supreme Court in *Patton v. Yount,* 467 U.S. 1025, 1038, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), "the determination is essentially one of credibility, and therefore largely one of demeanor. As we have said on numerous occasions, the trial court's resolution of such questions is entitled ... to 'special deference' ", and in *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 500, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), "The requirement that special deference be given to a trial judge's credibility determinations is itself a recognition of the broader proposition that the presumption of correctness that attaches

to factual findings is stronger in some cases than in others." We also determine that this is a case where the presumption should be stronger rather than weaker because, in this case, credibility determinations were pivotal.

*Part A.*

1. We will discuss the incidents alleged to have taken place on January 24, 2005 and May 6, 2005 together and the incident of January 26, 2005 separately.

■ We conclude that the evidence offered by the Board relating to the complaints of Maryann Kearney that Respondent, on January 24, 2005, as she was returning from the ladies room, asked her in the presence of others "if she needed a pencil to work it out" and that Respondent, on May 6, 2005, supposedly addressing a number of female employees in the lunchroom, said "How are you cunts doing?" or "Hey, you cunts, how are you doing?" does not meet the clear and convincing standard which the Board is obligated to attain.

In determining whether Respondent made the offensive remarks attributed to him by Maryann Kearney on those two dates—or not—our most important consideration is the testimony of those who heard what Respondent said or did not say, or who were in a position to hear, and the credibility of those witnesses.

As to the incident of January 24, 2005, seven or eight individuals were in a position to hear what Respondent did or did not say: one (Maryann Kearney) was presented by the Board, two (including Respondent) were presented by Respondent, four or five other individuals who were within hearing distance were not called and were never identified.

As to the incident of May 6, 2005 at least nine witnesses were in a position to hear

what Respondent did or did not say: one (Maryann Kearney) was presented by the Board, eight (including Respondent) were presented by Respondent.

We find Maryann Kearney's testimony to be unconvincing as to both incidents for at least the following reasons:

1. Although she testified the alleged remarks of January 24, 2005 "highly embarrassed her" and "really embarrassed" her she never told Respondent that the alleged remark embarrassed her or offended her in any way; nor did she ever tell anyone, including any of the other women who worked in the building with whom she had a close working relationship, that the alleged remark embarrassed her or offended her in any way. Nor did she tell Respondent or any of the other women that the alleged remark of May 6, 2005 embarrassed her or offended her in any way.

2. She did not file any complaint with the Judicial Conduct Board until August 22, 2005—seven months later; and, even then, in that complaint, she did not mention the incident of January 24, 2005 or the incident of May 6, 2005.

3. It was not until April 28, 2006, in a letter of that date which Respondent wrote to Board Investigator Delaney over a year later, that she made any report of the events she alleged occurred on January 24, 2005 or of May 6, 2005.

4. She delayed reporting these alleged incidents to the Board until April 28, 2006, after she read a newspaper article reporting that a judge had been disciplined for using vulgar language and shortly before Respondent had to face an opponent in the primary election of May 2006.

5. There is no evidence to explain or justify Maryann Kearney's delay in reporting Respondent's alleged remark of January 24, 2005 which she testified "highly embarrassed" her.

6. There is no evidence to explain or justify Maryann Kearney's delay in reporting Respondent's alleged remark of May 6, 2005.

It has long been recognized that the victim of a crime naturally would be expected to complain of the offense at the first safe opportunity. *See, Commonwealth v. Dillon,* 592 Pa. 351, 360, 925 A.2d 131, 137 (2007); *Commonwealth v. Snoke,* 525 Pa. 295, 580 A.2d 295 (1990); *Commonwealth v. Lane,* 521 Pa. 390, 555 A.2d 1246 (1989). This is a principle of the common law which has been codified in Pennsylvania with respect to sexual offenses. Title 18 Pa.C.S. § 3105 provides:

Prompt reporting to public authority is not required in a prosecution under this chapter: Provided, however, that nothing in this section shall be construed to prohibit a defendant from introducing evidence of the complainant's failure to promptly report the crime if such evidence would be admissible pursuant to the rules of evidence.

In *Dillon, supra,* the Pennsylvania Supreme Court stated:

Evidence concerning the timeliness of a complaint is contemplated both by statute (Section 3105 of the Crimes Code) *and by the principle* recognizing that a witness may be impeached if he or she remained silent on an occasion where it would have been natural to have spoken (emphasis added).

*Commonwealth v. Dillon, supra,* at 361, 925 A.2d at 137. *See, also, Commonwealth v. Lane, supra,* at 397, 555 A.2d at 1250. Thus, although the statute is directed at sexual offenses, the principle is not so limited but applies to "a witness ... [who] remained silent on *an occasion where it would have been natural to have spoken."*

If the occasions of January 24, 2005 and May 6, 2005 occurred as Maryann Kearney said they did and if she was offended as she said she was, then these were occasions where it would have been natural for Maryann Kearney to have spoken. However, she spoke to no one: not to the Respondent whose remarks it was which offended her; not to any of her girlfriends who worked in the building; and not even to the Judicial Conduct Board when she filed her personal complaint seven months later. It seems to us that it certainly would have been "natural" for her to have included these "highly embarrass[ing]" incidents in her formal complaint to the Judicial Conduct Board; however, of them no mention is made. Nor does the Judicial Conduct Board offer any explanation for this omission. According to our Supreme Court:

> In such cases the question of the sincerity of the complaint is raised if it is established that the delay under all of the factors present was either unreasonable or unexplained, .... The, the inference of insincerity is ... justified where the facts of the case fail to disclose a reasonable explanation for the challenged time lapse prior to the complaint.

*Commonwealth v. Lane, supra*, at 397–98, 555 A.2d at 1250.

We find that under all of the factors present in this case, Maryann Kearney's delay in reporting the incidents of January 24, 2005 and May 6, 2005 was both unreasonable and unexplained and the challenge to the sincerity of her complaints is justified.

7. Maryann Kearney's testimony was false, misleading and evasive. For example:

(a) She denied having a friendly relationship with Respondent before January 24, 2005. (N.T. 84). By itself, the fact that she purchased the sexually explicit birthday cards for Respondent (see Respondent's Exhibits 1, 2, 3 and 5) is enough to establish that her testimony on this question is not credible. No one would give these cards to anyone who was not a friend; and no one would give them to anyone such as Respondent who Mrs. Kearney testified was just "someone you would meet and worked with" (N.T. 84)—especially when the giver is a woman and the recipient is a man.[3] This is not to indicate or suggest that this is an important issue, but simply to demonstrate Maryann Kearney's evident reflexive antagonism for anything suggested by Respondent's lawyers, no matter how improbable is the position with which she is left—all of which makes for a witness who is difficult to believe.

(b) She spent considerable time on the witness stand sometimes denying that she selected the birthday cards, sometimes suggesting that she didn't sign or select all of them (N.T. 75–82), but she "might have" signed some of them (Exhibit 5, N.T. 80), sometimes stating she "couldn't recall" whether she ever saw the cards (Respondent's Exhibits 3 and 5) before they were presented to Respondent (N.T. 97), sometimes saying she was "on vacation" or "could have been sick" when they were

---

**3.** It is even more implausible that Maryann Kearney-or any women-would give these cards to someone with whom there had been no joking around previously, yet Maryann Kearney testified when asked:

Q. Never joked around with him?
A. No.
Q. Never said jokes to him?
A. No.
Q. Never said dirty jokes to him?
A. No. (N.T. 84)

This testimony was contradicted by every other female employee who was asked about it. (N.T. 109, 122, 126, 136, 138–39).

purchased. (N.T. 95). In contrast to this elusive testimony is the testimony of the seven other females who were employed in Nanticoke City Municipal Building with Maryann Kearney and Respondent and who were members of the Birthday Club. For example, Patricia Zendarski testified:

Q. There is a thing called I believe the Birthday Club. Are you familiar with that?

A. Correct.

Q. Up to January of 2005, would you agree with me that Maryann Kearney was primarily in charge of the Birthday Club?

A. Yes.

Q. And with regards to the Birthday Club, one of the things that she would do is she would go out and actually buy the cards that she would give to various people; is that correct?

A. Yes.

Q. And she would have the employees sign the cards; is that correct?

A. Yes.

Q. And she is the one who would choose the cards; is that correct?

A. Correct.[4] (N.T. 34).

During the course of Donna Wall's testimony, the Court inquired:

Judge Bucci: Just one question. Who purchased the birthday cards for the Birthday Club?

A. Mrs. Kearney did.

By Mr. Russin:

Q. She purchased all of them?

A. Yes. That I'm aware, yes.

Judge Bucci: Did she always purchase them?

A. When we had the Birthday Club as it was as that, yes. (N.T. 115).

Karen Wolfe testified:

Q. Now, were you aware of the Birthday Club?

A. Yes.

Q. Can you tell us how that worked?

A. We would pay Maryann so much money every paycheck, and she would get birthday cake and birthday cards for the birthday person.

Q. Who was in charge of that?

A. Maryann Kearney.

Q. Did she buy the cake?

A. Yes.

Q. Who bought the cards?

A. She did.

Q. And how would you sign the cards?

A. Just our name.

Q. How would you sign the cards?

A. She would pass it around.

Q. She would bring it from desk to desk?

A. Yes.

Q. Was there ever a time when she wouldn't be there, and it was somebody's birthday?

A. Yes, I guess.

Q. How would that work?

A. I think she bought cards ahead of time.

Q. But you are certain that she purchased all of the cards?

A. Yes. (N.T. 119–20).

---

4. Patricia Zendarski then testified that each of the four cards which are Respondent's Exhibits, 1, 2, 3 and 5 were purchased by Maryann Kearney (N.T. 35–38) and agreed that Respondent's Exhibit 4 "is a pin that Maryann Kearney purchased and gave to Judge Whittaker on behalf of the employees." (N.T. 38). This is the pin that says "you are cordially invited to go fuck yourself." Maryann Kearney denies that she ever saw the pin. (N.T. 80).

The other employees who testified were no less sure that Maryann Kearney had selected and purchased the cards. (N.T. 126–27, 132, 136, 153–54).

It is not surprising that Mrs. Kearney would attempt to distance herself from the birthday cards given what they say about her and her sensibilities; but all at the expense of the truth.[5]

(c) When asked if she would agree that she made no mention of the January 24, 2005 incident (the bathroom incident) in the complaint she filed with the Board in August 2005 she replied:

A. I don't remember. (N.T. 86).

When shown her complaint of August 2005 and asked:

Q. And would you agree with me that with regards to that complaint, never once did you make reference to this incident involving the bathroom; isn't that correct?

She replied:

A. Correct. (N.T. 87).

Likewise, when asked if she would agree that she never even mentioned the incident of May 6, 2005 (the "cunts" incident) in the complaint she filed with the Board in August 2005, she replied:

A. Yes. I did. (N.T. 91).

When shown her complaint of August 2005 and asked:

Q. Would you agree with me that in the complaint you filed with the Board, nowhere do you reference this incident where Judge Whittaker utilizes the words hey, you cunts?

She replied:

A. No, I didn't. (N.T. 92).

Likewise, when asked if she would agree that the first time she made any type of mention to the Judicial Conduct Board about Judge Whittaker utilizing the words "hey, you cunts" or about him referring to you needing "a pencil to work it out" was in April of 2006.

She replied:

A. No. (N.T. 92).

When shown the letter she had sent to the Board dated April 28, 2006 (Respondent's Exhibit 7) and asked:

Q. Would you agree with me that that is a letter that you prepared and sent to Mr. Delaney who is the investigator for the Conduct Board.

She replied:

A. Yes.

Q. And that letter is dated April 28, 2006?

A. Yes.

Q. And in that letter is when you reference the incident involving the pencil in the bathroom and the use of the word cunts; is that correct?

A. Yes.

Q. That is more than a year after these incidents allegedly happened; isn't that correct?

A. Yes. (N.T. 92).

Likewise, when asked about the letter of April 28, 2006 (Respondent's Exhibit 7):

Q. It is fair to say that you write that letter after you read a newspaper article where Judges have been disciplined for utilizing vulgar language; isn't that correct?

She replied:

---

**5.** Additional insight into Maryann Kearney's sensibilities and credibility is provided by the testimony of Veronica Navroth that on one occasion in the lunchroom Maryann Kearney displayed her matching leopard bra and pant-ies and on another occasion, also in the lunchroom, she placed her breast on Respondent's shoulder and he asked her to remove it. (N.T. 137).

A. No. (N.T. 93).

When shown the newspaper article (Respondent's Exhibit 8) and asked:

Q. That is a copy of a newspaper article which you sent to the Judicial Conduct Board; isn't that correct?

She replied:

A. Yes.

Q. That is your handwriting on that document; is that not correct?

A. It is, yes.

Q. You indicate that that article appeared in a local paper approximately a year before; is that not correct?

A. Yes.

Q. When did you see that article?

A. I cut it out the day it was in the newspaper, but I can't tell you when.

Q. The fact of the matter is that newspaper article references a Judge being reprimanded or disciplined for using vulgar language; isn't that correct?

A. Yes.

Q. So you read that article, and then you write your letter to the Board of April 28th; isn't this correct?

A. Yeah. (N.T. 93–94).

(d) As to the incident of May 6, 2005 (the "cunts" incident), Maryann Kearney's testimony is no less than bewildering and when it is examined any residual credibility she might have had is dissipated. On direct examination she testified:

Q. Mrs. Kearney, I am going to call your attention to an incident that occurred that you have stated occurred on or about May 6th, 2005. Do you recall hearing an unusual remark or statement from or uttered by Judge Whittaker on that date?

A. Yes.

Q. Would you explain it in your own words?

A. I was at my desk doing my work. Judge Whittaker came in the back door.[6] Apparently, he was dressed—

Q. I want you to hold on a moment. Using the pointer and referring to Joint Exhibit 6, where were you seated, ma'am?

A. I was seated at my desk here.

Q. Where you have indicated with the blue "x"?

A. Yes. Judge Whittaker came in this way, walked into the lunchroom. The girls that were here said to him oh, Judge, you really look sharp today.

And he said hey, you cunts, how are you doing?

And they all told him they did not like that word. And I really don't know. He must have turned around and walked back out of the room. (N.T. 71–72).

Thus, she says that both Respondent and "the girls" were *in the lunchroom* when the "cunts" remark was made. She is very clear on this for she says "Judge Whittaker *walked into the lunchroom*," then said "hey you cunts, how are you doing?" and then "*walked back out of the room.*"

But then the Court questioned her as follows:

Judge Musmanno: Mrs. Kearney, I am not clear. Are you in the lunchroom at this time?

6. If Mrs. Kearney was at her desk "doing [her] work," she had her back to the rest of the office, she had her back to the back door and she had her back to the lunchroom (see Joint Exhibit 6).

A. No, I am sitting at my desk.[7]

Judge Musmanno: Can you hear what *they* are saying *in the lunchroom* because you are across?

A. He was standing in the doorway. (N.T. 72).

So, the question is: is Mrs. Kearney testifying that Respondent was in the lunchroom or in the doorway? And how could she tell, since she couldn't see him in either case? And what difference does it make? We believe, as Judge Musmanno obviously did, that Respondent and the girls were in the lunchroom when Respondent is supposed to have addressed the girls as "cunts" and the girls are supposed to have responded that they didn't like that word. This, it seems clear, also was the understanding of counsel for the Board, for, after Mrs. Kearney's testimony was completed, he asked Lisa Kruczek during his cross examination of her:

Q. Counsel Mr. Russin had stated that . . . if you testified, you would specify that you had no recollection of Judge Whittaker using the phrase how are you cunts doing *to girls in a lunchroom*. (N.T. 129).

Our finding that Respondent was in the lunchroom that day really isn't dispositive of anything of importance because it doesn't matter where Respondent was standing because Mrs. Kearney couldn't see him whether he was inside the lunchroom or in the doorway (N.T. 73), and there is no evidence that such an insignificant difference in location would have affected her ability to hear him one way or the other.[8] Furthermore, and more important, it doesn't matter where the Respondent was standing or where the girls were sitting because, whether or not Respondent was in the lunchroom or in the doorway, and whether or not the girls were in the lunchroom or at their desks, they all testified that none of them heard Judge Whittaker use the word "cunts" on that day or on any other day. (N.T. 32–33, 97, 118, 129, 132, 136, 153). Moreover, we find each and every one of these witnesses to be credible and have no trouble finding their testimony to be truthful.

The most conspicuous thing about their testimony is that it contradicts Maryann Kearney's in almost every particular. This was brought to Maryann Kearney's attention during the trial and she was invited to explain it. She explained it as follows:

Q. So if Mr. Nardozzo walks into the court and says he never heard anything like that, he would be lying according to you?

A. Yes.

Q. And with regards to the cunt remarks, if Karen Wolfe testified she never heard anything like that, Donna Wall testifies she never heard anything like that, Veronica Navroth testified she never heard anything like that, they are all lying?

A. Yes.

Q. And according to you, I guess, the reason they are all lying is to cover up for Donny Whittaker?

A. Yes.

Q. So this is nothing more than a cover-up to protect him that is your testimony?

A. Yes.

---

7. See Note 6, *supra*.

8. Evidently sensing that the Court was having difficulty understanding how she, seated at her desk, could hear what Respondent was saying in the lunchroom (N.T. 72–74), she testified that he was *"yelling* to them hey, you cunts." (N.T. 91).

Given the circumstances, we allow that there was little else that Mrs. Kearney could say; but her suggestion that these witnesses deliberately entered into a conspiracy to cover-up for the Respondent, which necessarily required that each one commit the crime of perjury, we gently describe as far-fetched.

For all of the reasons set out above we find that the Judicial Conduct Board did not establish by clear and convincing evidence that Respondent engaged in the conduct described by Maryann Kearney on January 24, 2005 or on May 6, 2005.

2. We now address the incident alleged to have occurred on January 26, 2005.

According to the Board's Complaint, during a brief encounter that day with Maryann Kearney, Respondent's conduct was, in three respects, conduct which brings the judicial office into disrepute and consequently subjects Respondent to discipline under the Pennsylvania Constitution. That conduct was alleged to be:

(a) While Mrs. Kearney was blowing her nose, Respondent asked her "Did you get it all out?" or "Are you digging for gold?" (The "nose incident"),

(b) Respondent grabbed Mrs. Kearney around the neck with both hands and twisted her neck causing injury to her right shoulder (the "neck incident"),

(c) Respondent asked Mrs. Kearney "How do you give Bill a blow job?" (the "blow job incident").

■ As to (a): We find that the Board did establish by clear and convincing evidence that the "nose incident" took place as described by Mrs. Kearney; however, we find that Mrs. Kearney was not offended by it, and, even if she was, it was not a remark which brings the judicial office into disrepute under the Constitution and the holdings of this Court. *See, e.g., In re*

*Hamilton,* 932 A.2d 1030, 1033–35 (Pa.Ct. Jud.Disc.2007); *In re Zoller,* 792 A.2d 34, 37–39 (Pa.Ct.Jud.Disc.2002); *In re Kelly,* 757 A.2d 456, 458–59 (Pa.Ct.Jud.Disc. 2000); *In re Strock,* 727 A.2d 653, 656–57 (Pa.Ct.Jud.Disc.1998); *In re Trkula,* 699 A.2d 3, 7 (Pa.Ct.Jud.Disc.1997); *In re Cicchetti,* 697 A.2d 297, 312 (Pa.Ct.Jud.Disc. 1997), *aff'd* 560 Pa. 183, 743 A.2d 431, 443–44 (2000).

Mrs. Kearney's testimony, on the "nose incident" is uncontradicted, in fact, it was corroborated by the other two persons who were present, Respondent and Patricia Zendarski. However, Maryann Kearney's testimony, by itself, establishes that she was not offended, for, when asked if she "got it all out," she parried by asking Respondent: "Why, do you want to help?" That is not the rejoinder of someone who has been offended or embarrassed.

Moreover, it is not credible that Maryann Kearney, who selected the birthday cards which were given to Respondent (Respondent's Exhibits 1, 2, 3, 5) and who commonly used language as set out in Finding of Fact No. 11, *supra,* was offended by Respondent's question about her nose. Mrs. Kearney's insistence that she was (N.T. 87–88) serves only to damage her credibility even further.

■ As to (b): We find that the Board did not establish by clear and convincing evidence that Respondent placed both his hands around Maryann Kearney's neck and twisted it causing her injury as she alleged (the "neck incident"). Her allegations were contradicted by Respondent and Patricia Zendarski, the others who were present-both of whom testified that Respondent put one hand on her neck (Zendarski, N.T. 24, 29) on her shoulder (Whittaker, N.T. 163) for a very short

period[9] and that he did not twist her neck or use any force at all. (N.T. 29). It could not have happened both ways and in the face of the testimony of Respondent and Patricia Zendarski[10] and, in view of the difficulty we have with Maryann Kearney's testimony, we find that the Board has not established by clear and convincing evidence that "neck incident" occurred as set out in the Board's Complaint and as described by Maryann Kearney.

■ As to (c): We find that the Board has not established by clear and convincing evidence that Respondent asked Maryann Kearney at the conclusion of the "neck incident" on January 26, 2005: "How do you give Bill a blow job?" (the "blow job incident").

The only person who reported this incident is Patricia Zendarski, and, although we have no reason to question her credibility, we are not convinced that Respondent made the remark. Two factors contribute to this uncertainty: one is Respondent categorically denies it (N.T. 182–83), and we find Respondent to be a credible witness and judge it unwarranted to call his testimony untruthful; the other factor is that Maryann Kearney did not hear this question—which was addressed to her. Given Maryann Kearney's unmistakenly keen interest in learning of any offensive remarks which might be attributed to Respondent, we think that if this remark had been made—addressed to her as it reportedly was—she would have heard it and, most certainly, reported it. She did neither.

For these reasons we find that the Board has not established by clear and convincing evidence the allegations of the "blow job incident" set out in the Board's Complaint.

**Part B.**

■ We turn now to the charge that Respondent's employment with the Newport Township Fire Department contemporaneous with his service as a Magisterial District Judge was a violation of Rule 15A of the Rules Governing Standards of Conduct of Magisterial District Judges. (Complaint Count 3).

The undisputed facts are that from approximately 2000–01 to December 2006, while Respondent was serving as a Magisterial District Judge, he was employed by the Newport Township Fire Department as a fire truck driver. Respondent took that job partly as a community service because the Fire Department was having difficulty finding qualified fire truck drivers. His wages were small—in 2005 he earned $2,800. For each of the years of this employment he reported these earnings as required by the Supreme Court of Pennsylvania on the Statements of Financial Interest provided by the Administrative Office of Pennsylvania Courts (AOPC). (See Joint Exhibits 1–4). When

9. Whittaker said "maybe three seconds." (N.T. 163–64).

10. Patricia Zendarski testified:

    Q. Now you referenced that Donny used his one hand and put it on her neck?
    A. Yes.
    Q. Could you describe the degree of force? Was there any force applied from what you saw?
    A. No.
    Q. Did he twist her neck at all?
    A. No.
    Q. From what you saw, did he attempt to inflict any type of pain upon her?
    A. No. (N.T. 29).

In addition, Patricia Zendarski gave a statement to the Board in which she described the incident as follows: "When Donald Whittaker placed his hand on the back of her neck, he lightly touched her, there was no rough housing, he didn't shake her or grab her forcefully. This was done in jest and was typical conduct done by employees in the office. When she told him to stop, he did." (Board's Exhibit 2).

notified that his employment with the Fire Department might be a violation of a Rule Governing Standards of Conduct of Magisterial District Judges, Respondent immediately resigned from the job. Since then he has served as an unpaid volunteer.

Rule 15A of the Rules Governing Standards of Conduct of Magisterial District Judges provides:

A. Magisterial district judges shall not hold another office or position of profit in the government of the United States, the Commonwealth or any political subdivision thereof, except in the armed services of the United States or the Commonwealth.

We believe this case is "on all fours" with the case of *In re Crahalla*, 747 A.2d 980 (Pa.Ct.Jud.Disc.2000) and calls for the application of the same legal principles and considerations which governed our decision in that case.

In that case the Board charged that Respondent violated Rule 11 of the Rules Governing Standards of Conduct of Magisterial District Judges when he wrote a letter seeking contributions for the Boy Scouts. Rule 11 provides that "A [magisterial district judge] shall not solicit funds for any educational, religious, charitable, fraternal or civic organization...." In that case we said: [11]

One observation about that rule [Rule 11] which would be unlikely to provoke

controversy is that the proscribed activity is not inherently bad: if it is inherently anything, it is inherently good. Asking for contributions for the Boy Scouts [or driving a fire truck] is not an inherently evil act. It does not involve moral turpitude. It is, therefore, activity which our scholarly legal forefathers would classify as *malum prohibitum*— as opposed to, as distinguished from, *malum in se*.[12] This is a hoary jurisprudential distinction which is not hard to understand, and [we] would require some degree of *mens rea*[13] before finding a violation of this rule. In this case there was no "guilty mind" or "wrongful purpose"—no *mens rea* whatsoever—as demonstrated by Respondent's immediate resignation as Dinner Chairman [or as a fire truck driver] upon being advised that serving in that capacity was a possible violation of a Rule of Conduct.

In coming to this conclusion, [we] take guidance from the opinion of the United States Supreme Court in *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952). In that case, Morissette, while deer hunting in an uninhabited area in Michigan, took a quantity of spent bomb casings which he found heaped in piles on a former Air Force bombing range. He believed the casings were abandoned and made no effort to conceal his appropriation of

---

**11.** We quote at length from the opinion in Support of the Order of Dismissal in *Crahalla* because the cases are so similar and because we view the legal principles which we applied there, and which we apply here, as important in this Court's implementation of its duties under the constitutional amendments of 1993.

**12.** *Malum in se* is defined: "A wrong in itself; an act ... involving illegality from the very nature of the transaction, upon principles of natural, moral, and public law. An act is said to be *malum in se* when it is inherently and essentially evil, that is, immoral in its nature

and injurious in its consequences,...." Black's Law Dictionary 6th Ed., p. 959.

*Malum prohibitum* is defined as: "A wrong prohibited; a thing which is wrong *because* prohibited; an act which is not inherently immoral, but becomes so because its commission is expressly forbidden by positive law." (Emphasis in original). *Id.* at 960.

**13.** *Mens rea* is defined as: "As an element of criminal responsibility; a guilty mind; a guilty or wrongful purpose; a criminal intent." *Id.* at 985.

them.[14] He was indicted and convicted of stealing government property. The trial court refused to submit or to allow counsel to argue that Morissette acted "with innocent intention." The Supreme Court reversed, and, in reviewing this ruling, examined the raison d'etre for the requirement of criminal intent as an element of criminality in our jurisprudence. The Court observed:

The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil. [Citing Radin, Intent, Criminal, 8 Encyc. Soc. Sci. 126, for the history and philosophy of this concept in Biblical, Greek, Roman, Continental and Anglo–American law, and 2 Pollock and Maitland, History of English Law 448–511 for a more extensive treatment of the development in English Law, and Pound, Introduction to Sayre, Cases on Criminal Law (1927).] ... Unqualified acceptance of this doctrine was indicated by Blackstone's sweeping statement that to constitute any crime there must first be a "vicious will." ... Crime, as a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand, was congenial to an intense individualism and took deep and early root in American soil. As the states codified the common law

of crimes, even if their enactments were silent on the subject, their courts assumed that the omission did not signify disapproval of the principle but merely recognized that intent was so inherent in the idea of the offense that it required no statutory affirmation. Courts, with little hesitation or division, found an implication of the requirement as to offenses that were taken over from the common law. The unanimity with which they have adhered to the central thought that wrongdoing must be conscious to be criminal is emphasized by the variety, disparity and confusion of their definitions of the requisite but elusive mental element. However, courts of various jurisdictions, and for the purposes of different offenses, have devised working formulae, if not scientific ones, for the instruction of juries around such terms as "felonious intent," "criminal intent," "malice aforethought," "guilty knowledge," "fraudulent intent," "willfulness," "*scienter*," to denote guilty knowledge, or "*mens rea*," to signify an evil purpose or mental culpability. By use or combination of these various tokens, they have sought to protect those who were not blameworthy in mind from conviction of infamous common-law crimes. *Morissette v. United States*, 342 U.S. 246, 250–252, 72 S.Ct. 240, 96 L.Ed. 288.

The Court then pointed out that with the coming of the industrial revolution came the proliferation of a myriad of what it termed "public welfare offenses"[15] many of which did not in-

---

14. Similarly, in this case, Respondent made no effort to conceal his employment with the Newport Township Fire Department or his earnings therefrom, reporting them, as he did, on the Statements of Financial Disclosure filed each year with the AOPC.

15. Relating, for example, to the regulation of the distribution of food, drink, drugs, and products of any kind, even securities, workplace safety, motor vehicle traffic, environmental pollution. *See*, Sayre, Public Welfare Offenses, 33 Colum. L.Rev. 55, 73, 84, and, more generally, Hall, Prolegomena to a Sci-

clude a legislatively imposed requirement of specific intent as a necessary element. In rationalization or justification of the elimination of this element, the Court observed that the statutory penalties for these offenses:

> commonly are relatively small, and conviction does no grave damage to an offender's reputation. Under such considerations, courts have turned to construing statutes and regulations which make no mention of intent as dispensing with it and holding that the guilty act alone makes out the crime.

*Id.* at 256, 72 S.Ct. 240.

Before lumping the Rule of Conduct here involved with the "public welfare offenses" referred to by the Supreme Court in *Morissette* and dismissing the absence of specific intent from our deliberations, [we] believe the following considerations are important, and call for the opposite conclusion on the question:

1. In *Morissette*, the Supreme Court stated that the courts' construing statutes and regulations which make no mention of intent as dispensing with it "has not, however, been without expressions of misgiving." *Morissette, supra*, at 256, 72 S.Ct. 240. And the Supreme Court hastened to add:

> Neither this Court nor, so far as we are aware, any other has undertaken to delineate a precise line or set forth comprehensive criteria for distinguishing between crimes that require a mental element and crimes that do not. We attempt no closed

definition, for the law on the subject is neither settled nor static.

*Id.* at 260, 72 S.Ct. 240.

It is, therefore, the courts' ongoing responsibility to assess the legislative intent on a case by case basis to determine whether that intent would be thwarted by requiring *scienter* as a necessary element of a given offense. *See, United States v. Balint,* 258 U.S. 250, 251–252, 42 S.Ct. 301, 66 L.Ed. 604 (1922).

In this case, the legislative purpose to discourage the conduct described in Rule 11 [Rule 15A], is not thwarted by requiring the element of *scienter* to constitute a violation of the rule, but is given full effect by Respondent's self-correction instantly imposed without the necessity of any coercion or encouragement from the Judicial Conduct Board.

2. The "penalties" attendant to a finding of a violation of Rule 11 [Rule 15A] are not "relatively small," [16] ranging, as they do, from reprimand to removal from office.

3. Whereas the Supreme Court found the effect of a conviction of a public welfare offense on the reputation of the offender as negligible, the injury to the reputation of a judicial officer "disciplined" by this Court cannot be overassessed.

4. Another Supreme Court case, *Lambert v. California,* 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957) provides, [we] think, insight into discovering what guides that Court in

---

ence of Criminal Law, 89 U. of Pa. L.Rev. 549; Hall, Interrelations of Criminal Law and Torts, 43 Colum. L.Rev. 753, 967.

**16.** See, also, e.g., *People ex rel. Price v. Sheffield Farms–Slawson–Decker Co.,* 225 N.Y. 25, 32–33, 121 N.E. 474, 477 (1918) where then

Judge Cardozo pointed out, as a basis for penalizing violations whether intentional or not, that they were punishable only by fine "moderate in amount" and added "we are not to be understood as sustaining to a like length the power to imprison."

determining when specific intent or *scienter* should constitute a necessary element of an offense.

In that case the defendant was convicted under a California law which required anyone convicted of a felony to register with the local police. Stating the question to be: "whether a registration act of this character violates due process where it is applied to a person who has no actual knowledge of his duty to register," the Court stated:

> We do not go with Blackstone in saying that "a vicious will" is necessary to constitute a crime, 4 Bl. Comm. 21, for conduct alone without regard to the intent of the doer is often sufficient. There is a wide latitude in the lawmakers to declare an offense and to exclude elements of knowledge and diligence from its definition. [citation omitted]. But we deal here with conduct which is wholly passive—mere failure to register. It is unlike the commission of acts, or the failure to act under circumstances which should alert the doer to the consequences of his deed.

*Lambert v. California, supra,* at 228, 78 S.Ct. at 242–43.

Thus, the Supreme Court in *Lambert* drew the line in the constitutional sand on the basis of "passive" versus "active"—a notion which the dissenting Justices easily exposed as a contrivance employed to reach a result deemed just and desirable by the majority of the Court. Mr. Justice Frankfurter, writing the dissent, pointed out that:

> The present laws of the United States and of the forty-eight States are thick with provisions that command that some things not be done and others be done, although persons convicted under such provisions may have had no awareness of what the law required or that what they did was wrongdoing.... Considerations of hardship often lead courts, naturally enough, to attribute to a statute the requirement of a certain mental element—some consciousness of wrongdoing and knowledge of the law's command— as a matter of statutory construction.... But what the Court here does is to draw a constitutional line between a State's requirement of doing and not doing. What is this but a return to Year Book distinctions between feasance and nonfeasance—a distinction that may have significance in the evolution of common-law notions of liability, but is inadmissible as a line between constitutionality and unconstitutionality.

Thus, it is apparent that the Supreme Court was not determining the location of the line on the basis of a distinction between "active" and "passive" but rather on whether the right result is clearly recognizable—as it was in *Lambert,* and, [we] believe, is, certainly, here. So, [we] would here, for various considerations, hardship included, "attribute to [this rule] the requirement of a certain mental element—some consciousness of wrongdoing and knowledge of the [rule's] command—as a matter of statutory construction."

5. The decision of the United States Supreme Court in the more recent case of *Staples v. United States,* 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994) confirms this conclusion. In that case, Staples was charged with possessing an unregistered machine-

gun in violation of 26 U.S.C. § 5861(d). The weapon in question was a semiautomatic rifle—not a machinegun—which had been modified to provide fully automatic fire. Staples maintained that he was ignorant of any automatic firing capability. The district court refused, however, to charge the jury that the Government was required to prove that Staples knew of that capability. He was convicted and the Court of Appeals affirmed. The Supreme Court reversed.

The Supreme Court construed the statute requiring the registration of machineguns as requiring a showing of *mens rea* even though the statute was silent on that subject. Its holding was based on two major points:

(1) the nature of the regulated conduct (the ownership of firearms) was not such that would alert gun owners to the likelihood of regulation (because owning guns is lawful), and

(2) the penalty attached was not relatively small as are those commonly associated with "public welfare offenses," but severe (up to ten years imprisonment), so that it was unlikely that Congress intended to dispense with *mens rea* as a necessary element of the offense.

On the first point, after noting that the statute was silent concerning the *mens rea* required for a violation, the Court, drawing liberally from its earlier opinion in *Morissette, supra,* stated:

> [T]he existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo–American criminal jurisprudence. . . . Relying on the strength of the traditional rule, we have stated that offenses that require no *mens rea* are generally disfavored, *Liparota [v. U.S.,* 471 U.S. 419] *supra,* at 426, [105 S.Ct. 2084, 85 L.Ed.2d 434 (1985)] and have suggested that some indication of congressional intent, express or implied, is required to dispense with *mens rea* as an element of a crime. *Id.* at 605–606, 114 S.Ct. at 1797.

Referring to "public welfare offenses" which do not require *mens rea,* the Court stated:

> Typically, our cases recognized such offenses involve statutes that regulate potentially harmful or injurious items. . . . In such situations, we have reasoned that as long as a defendant knows that he is dealing with a dangerous device of a character that places him "in responsible relation to a public danger," [*U.S. v.*] *Dotterweich,* [320 U.S. 277] *supra,* at 281, [64 S.Ct. 134, 88 L.Ed. 48 (1943)] he should be alerted to the probability of strict regulation, . . . . Thus, we essentially have relied on the nature of the statute and the particular character of the items regulated to determine whether congressional silence concerning the mental element of the offense should be interpreted as dispensing with conventional *mens rea* requirements. *Id.* at 607, 114 S.Ct. at 1798.

In this context the Court addressed the possession of firearms which was involved in the case at hand, as follows:

> But that an item is "dangerous," in some general sense, does not necessarily suggest, as the Government seems to assume, that it is not also entirely innocent. Even dangerous items can, in some cases, be so com-

monplace and generally available that we would not consider them to alert individuals to the likelihood of strict regulation. As suggested above, despite their potential for harm, guns generally can be owned in perfect innocence. Of course, we might surely classify certain categories of guns—no doubt including the machineguns, sawed-off shotguns, and artillery pieces that Congress has subjected to regulation-*as items the ownership of which would have the same quasi-suspect character we attributed to owning hand grenades in Freed. But precisely because guns falling outside those categories traditionally have been widely accepted as lawful possessions, their destructive potential, while perhaps even greater than that of some items we would classify along with narcotics and hand grenades, cannot be said to put gun owners sufficiently on notice of the likelihood of regulation to justify interpreting § 5861(d) as not requiring proof of knowledge of a weapon's characteristics.

*Staples v. United States*, 511 U.S. at 611–612, 114 S.Ct. at 1800. If the dangerousness of firearms is not enough to alert an individual to the likelihood of regulation so as to justify dispensing with *mens rea*, then neither is soliciting funds for the Boy Scouts [or driving a fire truck for the Fire Department].

On the second point the Court said:

> Historically, the penalty imposed under a statute has been a significant consideration in determining whether the statute should be construed as dispensing with *mens rea*. Certainly, the cases that first defined the concept of the public welfare offense almost uniformly involved statutes that provided for

only light penalties such as fines or short jail sentences.... As commentators have pointed out, the small penalties attached to such offenses logically complemented the absence of a *mens rea* requirement. In a system that generally requires a "vicious will" to establish a crime, 4 W. Blackstone, Commentaries, imposing severe punishments for offenses that require no *mens rea* would seem incongruous.

*Id.* at 616–617, 114 S.Ct. at 1802–03. The Court concluded:

> We need not adopt such a definitive rule of construction to decide this case, however. Instead, we note only that where, as here, dispensing with *mens rea* would require the defendant to have knowledge only of traditionally lawful conduct [possessing guns], a severe penalty is a further factor tending to suggest that Congress did not intend to eliminate a *mens rea* requirement.

*Id.* at 618, 114 S.Ct. at 1804.

As mentioned earlier, the penalties to which judicial officers who violate the Rules of Conduct are exposed are severe and the injury to their reputations large, and, thus, the Supreme Court's decision in *Staples* is a strong statement against the elimination of a *mens rea* requirement in this case.

6. [We] liken the element of self-correction in this case to the rationale for the designation of "Renunciation" as a defense to the offense of Criminal Solicitation. This is set out at 18 Pa. C.S.A. § 902 which, after reciting the definition of solicitation, provides:

(b) Renunciation—It is a defense that the actor, after soliciting another person to commit a crime, persuaded him not to do so or otherwise

prevented the commission of the crime, *under circumstances manifesting a complete and voluntary renunciation of his criminal intent* (emphasis added).

Certainly, Respondent's immediate resignation as Dinner Chairman [as a paid fire truck driver] manifests his complete and voluntary renunciation of any impropriety and constituted a self-executing enforcement of Rule 11 [Rule 15A].

For these reasons [we] would hold that the drafters of Rule 11 [Rule 15A] did not intend to eliminate a *mens rea* requirement for violation of the rule, and Respondent's immediate and voluntary cessation of the activity establishes the absence of that element in this case, and [we] would dismiss the Complaint.

We believe that, if anything, the absence of *mens rea* in this case is even more demonstrable than in *Crahalla;* for, in this case, Respondent dutifully filed the Statements of Financial Disclosure with the AOPC every year for five years on which he dutifully reported his earnings from the Township job, *and heard nothing from the AOPC.* So, here, in addition to publicly announcing that he had this job and that it was a "position of profit"—certainly the action of one who believes what he is reporting does not involve any wrongdoing; and certainly at variance with one who knows what he is reporting is wrongdoing, involving, as it does, a violation of a rule of conduct—Respondent had every reason to expect that if the facts reported on the Statements disclosed a violation of a rule of conduct, *the AOPC would have told him.* It was the AOPC's duty to do so—what other reason for the required filing? Maybe the AOPC, like Respondent, didn't know that the earnings reported constituted a violation of Rule 15A. Whatever the

reason for the AOPC's silence on the subject, it was plainly reasonable for Respondent to regard it as confirming his belief that this job on the fire truck was entirely innocent and not violative of anything.

We here affirm the conclusion reached in *Crahalla* and adopt the reasoning set forth in the Opinion In Support of the Order of Dismissal quoted above and find that the Judicial Conduct Board has not established that Respondent's employment as a fire truck driver for the Newport Township Fire Department was a violation of Rule 15A of the Rules Governing Standards of Conduct of Magisterial District Judges.

## IV. CONCLUSIONS OF LAW

1. The Judicial Conduct Board has not established by clear and convincing evidence the allegations of Respondent's conduct on January 24, 2005, January 26, 2005 and May 6, 2005.

2. Respondent's employment as a fire truck driver for the Newport Township Fire Department was not a violation of Rule 15A of the Rules Governing Standards of Conduct of Magisterial District Judges.

PER CURIAM.

### ORDER

AND NOW, this 10th day of April, 2008, based upon the Opinion filed herewith, it is hereby ORDERED:

That, pursuant to C.J.D.R.P. No. 503, the attached Opinion with Findings of Fact and Conclusions of Law be and it is hereby filed, and shall be served upon the Judicial Conduct Board and upon the Respondent,

That either party may elect to file written objections to the findings and conclusions of the Court, stating therein the basis for those objections, provided that such objections shall be filed with the

Court within ten (10) days of the date of the entry of this Order, and a copy thereof served upon the opposing party,

That, in the event such objections are filed, the Court shall determine whether to entertain oral argument upon the objections, and issue an Order setting a date for such oral argument, and

That, in the event that timely objections are not filed within ten (10) days, or the Court decides that oral argument shall not be presented, this Court will issue an Order dismissing the Board's Complaint.

Judge, J., did not participate in the consideration or disposition of this case.

PER CURIAM.

### ORDER

AND NOW, this 22nd day of April, 2008, it is hereby ORDERED that the Complaint against the Respondent is DISMISSED.